**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

**BAHRAM OMIDIAN and RAMONA OMIDIAN,**
*on behalf of their child, K.O., a student with a*
*disability,*

                    **Plaintiffs,**

            **v.**                                    **6:06-CV-1171**
                                                      **(NAM/GHL)**

**BOARD OF EDUCATION OF THE NEW**
**HARTFORD CENTRAL SCHOOL DISTRICT,**


                    **Defendant.**
_____

**APPEARANCES:**                          **OF COUNSEL:**

Young, Sommer, Ward, Ritzenberg,           Kenneth S. Ritzenberg, Esq.
Baker & Moore, LLC
Executive Woods
5 Palisades Drive
Albany, NY 12205
*Attorney for Plaintiffs*

Ferrara, Fiorenza, Larrison,               Susan T. Johns, Esq.
Barrett & Reitz, P.C.
5010 Campuswood Drive
East Syracuse, NY 13057
*Attorney for Defendant*

**Norman A. Mordue, Chief U.S. District Judge:**

                    **MEMORANDUM DECISION AND ORDER**

**I.      INTRODUCTION**

        Bahram Omidian and Ramona Omidian ("plaintiffs") bring this action on behalf of their

child, K.O., a student with a disability.  In their first cause of action, plaintiffs allege that

defendant Board of Education of the New Hartford Central School District ("the District")

violated K.O.'s substantive and procedural rights under the Individuals with Disabilities

Education Act, ("IDEA"), 20 U.S.C. § 1401 *et seq*., and Article 89 of the New York State Education Law.  Plaintiffs seek reimbursement from the District for the tuition and costs associated with their unilateral placement of K.O. at The Family Foundation, a private residential school in Hancock, New York, during the 2004-2005, and 2005-2006 school years when K.O. was in tenth, eleventh, and twelfth grades.  In their second cause of action, plaintiffs allege that the District violated K.O.'s rights under Section 504 of the Rehabilitation Act, 29 U.S.C. § 794, by discriminating against him because of his disability.  Presently before the Court are the parties' motions for summary judgment.

Plaintiffs previously filed a complaint against the District seeking reimbursement for tuition and costs arising from their placement of K.O. at the Family Foundation during the 2002-2003 and 2003-2004 school years.  *Omidian v. Board of Ed. of the New Hartford Cent. Sch. Dist*., 6:05-cv-0398. ("*Omidian I*").  Like the instant case, plaintiffs filed *Omidian I* after failing to obtain relief in a New York State administrative proceeding ("Proceeding I").  In that case, the Court granted the District's motion for summary judgment and dismissed plaintiffs' IDEA claim on the basis that the Family Foundation was not an appropriate placement for K.O.  The Court, however, denied the parties' motion for summary judgment on plaintiffs' Rehabilitation Act claim, finding a question of fact as to whether the District's actions constituted discrimination.

## II.    THE IDEA

The purpose of IDEA is "to ensure that all children with disabilities have available to them a free appropriate public education that emphasizes special education and related services designed to meet their unique needs[.]" 20 U.S.C. § 1400(d)(1) (A). The IDEA "mandates federal grants to states to provide disabled children with a 'free appropriate public education' in the least

2

restrictive appropriate environment." *Polera v. Bd. of Educ.*, 288 F.3d 478, 481 (2d Cir. 2002)

(citing 20 U.S.C. §§ 1400(d)(1)(A), 1401(8), 1411(a)(1) & 1412(a)(5)(A)).  A school district

administers its services through the development of an "individualized education program"

("IEP") for each disabled child.  20 U.S.C. § 1414(d).  In New York State, local committees on

special education ("CSE") are responsible for developing appropriate IEPs.  *Walczak v. Florida*

*Union Free Sch. Dist.*, 142 F.3d 119, 123 (2d Cir. 1998) (citing N.Y. Educ. Law § 4402(1)(b)(1)

and *Heldman v. Sobol*, 962 F.2d 148, 152 (2d Cir. 1992)).  Parents who believe that the state has

failed to provide their child with a free appropriate public education "may, at their own financial

risk, enroll the child in a private school and seek retroactive reimbursement for the cost of the

private school from the state." *Gagliardo v. Arlington Cent. Sch. Dist*, 489 F.3d 105, 111 (2d Cir.

2007) (citing *Sch. Comm. of the Town of Burlington v. Dep't of Educ.*, 471 U.S. 359, 370 (1985)).


## II.    BACKGROUND

The facts from which this case arise are contained in the Memorandum-Decision and

Order entered March 31, 2009, *see Omidian I*, Dkt. no. 27, familiarity with which is assumed.

The following facts are from the exhibits and testimony received during a proceeding before

Impartial Hearing Officer Martin Kehoe regarding the 2004-2005 and 2005-2006 school years.[1]

("Proceeding II").  K.O., who has been diagnosed with, *inter alia*, oppositional defiance disorder

and mood disorder, was classified as emotionally disturbed at age twelve.[2]  K.O., at plaintiffs'

---

[1]The IHO also received the exhibits and transcripts of testimony from Proceeding I into the
record.

[2]K.O.'s date of birth is August 17, 1988.

expense, attended and resided at the Family Foundation year round since plaintiffs placed him there on April 8, 2003, at age fourteen, and through the 2004-2005 and 2005-2006 school years. The District's CSE has met annually to review K.O.'s IEP, but the parties have disagreed as to the appropriate education for K.O. since the 2002-2003 school year when the District issued an IEP recommending that K.O. attend a Board of Cooperative Education Services ("BOCES") special education class with twelve students, one teacher, and one aid.  Plaintiffs have maintained that K.O. has required residential placement as a result of his emotional disability since 2001.

In a letter dated May 21, 2004, Race advised plaintiffs that an annual review meeting to discuss an IEP for the 2004-2005 school year was scheduled for June 23, 2004, and requested that they sign and return a release of information form so the District could obtain updated information on K.O.'s "current levels of performance".  Ex. 6.  Race also requested a "copy of any counseling, social work, psychological, or psychiatric evaluations conducted since September 2003".  *Id*.

In a letter dated June 9, 2004, to Robin Ducey of the Family Foundation, Race requested information regarding K.O.'s progress.  Ex. 8.  Race also requested that the Family Foundation make one of K.O.'s teachers as well as a social worker or counselor working with K.O. available by phone for the upcoming CSE meeting.  Ex. 8.

In a therapy note dated June 9, 2004, Jeffrey Brain, a consulting psychologist[3] at the

Family Foundation, Transcript ("T."), p. 369, stated:

> In his first two semesters here, he reports having a lax attitude and a tendency to give
> up. This most recent semester, he feels he has improved and is passing all of his
> classes. Spanish and Math are the classes he feels he is liking and doing best in. He
> is about 6 months behind; he is in 10th grade math, but in 9th/10th grade English.
> Behaviorally, he is doing well in school. He is not on any school related sanctions.
> He is hoping to be able to graduate with a regents diploma and is considering
> becoming a priest, having "found" God while here at the school.

T. 374, Ex. 33.

In a letter dated June 11, 2004, "To Whom it May Concern", Renee Gotthardt stated:

> [K.O.] was enrolled at The Family Foundation School on April 3, 2003. His history
> of problems includes: disobeying rules and orders, verbal and physical aggression,
> substance use, academic underachievement, disordered eating habits, and
> psychological problems (treatment of problems included the use of Lexapro).
>
> The Family Foundation School, a residential facility for high-risk adolescents, can
> provide [K.O.] with an environment where troubled adolescents have the opportunity
> to develop coping and social skills through counseling and group therapy. He
> received weekly group therapy and individual therapy is provided when required.
> The school provides psychological, moral, and academic training to educate students
> and help them to mature into healthy individuals. [K.O.] is beginning to make changes
> in his lifestyle and is incorporating the twelve steps into his life to deal with daily
> issues. He has discontinued the use of psychotropic medicine under the supervision
> of a psychiatrist, is now associating with a positive peer group, and is beginning to
> display appropriate behavior. I believe that he would be best served within this
> structured environment. It is likely that his functioning would continue to improve
> by remaining in this setting.

---

[3]Renee Gotthardt, a social worker at the Family Foundation, testified that the Family
Foundation has psychiatrists and psychologists available on a "consultant basis." T. 257.
Gotthardt stated that the Family Foundation provides family counseling, as well as
psychological, moral, and academic training, T. 267, but that there is a belief at the Family
Foundation that traditional individual counseling does not work for most of its students. T. 290.
Gotthardt explained that most students have been in settings where they have attended
individual counseling and it did not work because they have been able to avoid going to the
counseling sessions, have not participated actively, or have lied "through the session". *Id*.

> While [K.O.] has made significant improvement during his stay at The Family Foundation School, he still presents a series of emotional and functioning problems. He is socially immature, tells lies, and has difficulty in the classroom both in academic achievement and motivation. In a normal school setting, I believe that [K.O.] would revert to adverse behavior. He is still attracted to a deviant lifestyle, wishes to belong to a "cool" crowd, and has not developed a sufficient internal sense of self to be able to resist the influence of a negative peer group. He is easily distracted and his grades would suffer without a structured classroom environment. He still has a difficult time determining appropriate behavior and holding himself accountable for his actions.

Ex. 34.

In a "Teacher's Summary" dated June 11, 2004, "Mary - Global II" wrote that K.O. had missed five days and been late seven times since January 2, 2004. Ex. 23. K.O.'s teacher further indicated that he failed two homework assignments and had to redo two others, that he "hardly ever participates", but was "generally respectful". *Id*. K.O.'s teacher noted that K.O.'s interactions with peers appeared appropriate, and that his grades had improved, but that he "still fails too many quizzes + tests". *Id*. K.O.'s teacher also commented that he "tends to get angry over little things; takes self too seriously at times; needs to develop a sense of humor." *Id*.

In a summary dated June 11, 2004, K.O.'s math teacher wrote that K.O.'s homework was "[a]lways completed", his class participation was "[a] little below what I would expect from him", that he was sensitive and "likes to joke with others" but "gets hurt feelings when they do the same to him". *Id*.

In a summary dated June 11, 2004, K.O.'s earth science teacher stated that he was sometimes late for class, completed all homework assignments on time, and participated in class discussions. *Id*. The teacher noted that K.O. "can act immature with staff, especially when he does not get his way", but he "gets along well with peers." *Id*.

In a summary dated June 11, 2004, K.O.'s English 10 teacher stated that his attendance and homework completion were good, but that he did not participate "as much as he could" in class discussions.  *Id*.  Additionally, K.O.'s teacher commented that he "is a likeable young man - his major problem in English is his lack of control when it comes to talking  w[ith] his friends".  *Id*.

Gotthardt stated that in June 2004, K.O. was "having some ups and downs":

> but his grades were really dependent on his emotional stability at the time.  If he was feeling good . . . then his grades reflected that . . . and if he were falling back into the sullenness and the depressive kind of quality about [K.O.], then his grades reflected that as well.  He was having some difficulty relating appropriately socially to other students, was lying a great deal, was having trouble communicating with the other students in a way that . . . was honest and sort of heartfelt.  Everything was very shallow and surfacey at the time.  Really . . . was keeping people at an arms length away, didn't have any real close friendships at the time and that had changed.

T. 270.

Gotthardt explained that when K.O. first enrolled:

> He was very sullen, very angry, really had a difficult time making and keeping friends and over the course of that year, in this sort of roller coaster pattern of ups and downs, there were months and weeks when he really was doing well socializing, finding some friends and then would sort of dismiss them all, somehow find a way to back them all off, and so there was change in behavior in that he was learning how to communicate with others.  He wasn't so sullen and depressed but of course that depended on the moment, on whether or not he was being honest and that really was the key issue.  When he got caught in a lie, he turned back onto the angry and sullen self.

T. 272.

K.O.'s mother testified that in June 2004, K.O. "still was very oppositional defiant . . . . He still had difficulty being motivated to do his work, his homework at times, but it was improving.  He was still having issues with the negative emotions, his anger, controlling his anger."  T. 561.

7

A CSE meeting was held on June 23, 2004 to discuss the IEP for the 2004-2005 school year.  Ex. 10.  Race, school psychologist Leo Smith, a special education teacher, a regular education teacher, a parent representative, principal of Oneida BOCES Ellen Mahanna, the District's attorney, and K.O.'s mother were all present.  *Id*.  Plaintiffs' attorney, and Family Foundation guidance counselor Vicky Kravetsky attended by conference call.  *Id*.  The minutes indicate that K.O. had a dramatic improvement in self-esteem, "difficulty with being corrected", "gets along well until someone expects him to do his job", "when confronted gets sulky/angry".  *Id*.  The minutes state that K.O. was attending weekly group counseling sessions with a staff member "working thru 12 steps", but that K.O. had received  "no individual counseling".  *Id*.

Ellen Mahanna, principal for the special education programs at Oneida BOCES attended the CSE meeting and explained the Westmoreland BOCES program that the District planned to recommended for K.O.  T. 442, District Ex. F.  Mahanna testified that at the meeting, she learned that K.O. was doing "very well" and "had improved in his areas of need in regards to behavioral needs" and that she believed K.O.'s needs could be met in "the 12:1:1 adjustment program" at Westmoreland BOCES.  T. 443.  At the meeting, Kravetsky stated that K.O. had not received special education instruction or accommodations.  District Ex. F.

 K.O.'s mother testified that when she heard that the CSE was recommending the BOCES program for the 2004-2005 school year she was "extremely upset" and "knew it wasn't the right place for K" because "he needed a residential placement."  T. 561.  K.O.'s mother further stated that it "would have been a real issue, considering he was defiant" getting him to Westmoreland every day, which was approximately 45 minutes from home.  T. 561-62.  According to the

minutes, plaintiffs' attorney informed the CSE that plaintiffs' believed K.O. required residential placement and rejected the IEP.  District Ex. F., T. 562.

On July 20, 2004, the CSE issued the 2004-2005 IEP.  Ex. 11.  The IEP recommended that K.O. be placed in a class with twelve students, one teacher, and one aide in the Westmoreland BOCES program.  Ex. 11.  The IEP stated that K.O.'s grades were within average range, and that he completed homework on time and in an acceptable manner  "but needs to be monitored."  *Id*. Regarding K.O.'s social development, the IEP stated that his self-esteem had improved, and that he got along well with his peers, but that he was sensitive and his feelings were hurt when peers joked with him.  *Id*. The IEP reflected K.O.'s ninety-five pound weight loss.  *Id*.  Regarding his management needs, the IEP stated that K.O. "needs monitoring of homework, and to continue to improve peer relationships [sic].  He continues to work on self-esteem issues and accepting constructive criticism in an appropriate manner."  *Id*.

The IEP recommended that K.O. be placed in a special education program outside general education, and receive individual counseling twice and group counseling once a week.  *Id*.  The IEP contained testing accommodations and indicated that the CSE would review K.O.'s progress after ten weeks to determine whether mainstreaming was possible.  *Id*.  The IEP contained goals and objectives related to: demonstrating appropriate study skills; identifying positive personal attributes; identifying and demonstrating strategies for interacting with peers; exercising self-control when he is frustrated or stressed; appropriate classroom behavior; and completing homework.  *Id*. The IEP specified that a Regents high school diploma was "sought" and that K.O. planned to attend college.  *Id*.

As stated above, plaintiffs rejected the 2004-2005 IEP and K.O. spent the 2004-2005 school year at the Family Foundation.[4]  K.O.'s mother testified that K.O. did "very well" at the Family Foundation during the 2004-2005 school year.  T. 564.  Specifically, K.O.'s grades improved, he was involved in sports and drama activities, he lost approximately 120 pounds, he was sponsoring a newer student, was involved in personal training and helping other children who are overweight, and was head of the wait staff for his family unit[5] at the Family Foundation.  T. 564-65.

A student accident report form dated October 4, 2004, indicated that K.O. cut his right leg when he "deliberately kicked a window out of anger."  Ex. 23.  K.O.'s mother testified that this incident occurred after "family leader" Robin Ducey told K.O. and a girl in the "family" that they had to stop their relationship, and that one of them had to "be removed from that family to break up this attraction".  T. 578.  According to K.O.'s mother, Ducey suggested that K.O. be removed "and he was not happy about it . . . . [s]o he . . . left the room . . . walked down the hall and deliberately kicked out one of the windows in the hallway."  T. 579.  K.O.'s mother testified that although K.O. went through a difficult time when the girl left the school, once she was gone "he seemed to turn around."  T. 593.  K.O.'s mother stated that his grades "increased dramatically", he became a leader in his family, and was involved in sports and drama.  *Id.*

---

[4]The IEP indicated that K.O.'s "current grade" was "11".  Ex. 11.

[5]The Family Foundation operates in eight family units with "a pseudo mother and father staff people" and approximately thirty students "who act as brothers and sisters, look out for one another, care for each other."  Proceeding I, Transcript, p. 991.  Each family has a boys' dorm and a girls' dorm.  Proceeding I, T. 994.  The students are responsible for cooking, cleaning, and laundry.  Proceeding I, T. 995.

10

In a report dated November 10, 2004, Dr. Ivan Fras, consulting psychiatrist for the Family Foundation, stated that K.O. was referred to him because K.O. "[h]as been violent.  Kicked in a window and pushed another student".  Ex. 23.  Dr. Fras stated that K.O. "is trying to talk his way out of the consequences of his behavior.  Not very responsible.  He does not impress me that he is trying very hard." *Id*.

In a letter dated November 10, 2004, "To Whom It May Concern", Gotthardt wrote:

> [K.O.] was enrolled at The Family Foundation School on April 3, 2003, by his parents to provide an atmosphere of healing for him to work through academic issues, compulsive overeating, social limitations, and problem/destructive behavior.  While he struggles daily with "doing the right thing," he has had success in repairing family relationships, has achieved a level of academic achievement commensurate with his potential, has learned to relate appropriately to peers and authority figures, and has learned coping skills to help control his problem behavior. [K.O.] is making efforts to amend any harm to others that may have occurred due to his prior impulsive behavior and anger-driven act outs.  He is good physical condition, has lost quite a bit of weight, and has gained control over his compulsive eating habits.

> However, [K.O.] still struggles with negative emotion on a daily basis.  He often falls into resentment and self-pity, feeling licensed to break rules to make him feel like he is in control.  Most recently, he was sanctioned heavily for having an inappropriate relationship with a female student.  While the infraction seemed severe, we could see the progress that had been made in that [K.O.] was able to open up about the incident and take responsibility for his actions.  He is learning, through trial and error, how to fall and pull himself back up again.

Ex. 36.

In a letter dated December 12, 2005, addressed to "Dear Sir/Madam" Dr. Fras wrote that K.O.:

> has made moderate progress since his enrollment in the Family Foundation School in April of 2003, however he continues to exhibit a great deal of negative behavior with occasional destructiveness.

> I am convinced that outside of this highly structures therapeutic environment, this patient would not make progress, and would most likely relapse into severe behavioral difficulties.

> My recommendation is for [K.O.] to remain at The Family Foundation School until
> he successfully completes the program.

Ex. 23.

In a letter dated December 13, 2004, K.O.'s father wrote to the Family Foundation to

request that K.O. "have an updated Psychiatric evaluation from Dr. Fras." Ex. 37.  In a letter to

Dr. Fras dated December 17, 2004, K.O.'s father wrote:

> I am requesting an updated Psychiatric evaluation for my son, K[.O.] who attends
> The Family Foundation School.  The last evaluation you did was in August 2003.
> K[.O.] has been at the Family School for 20 months now and has made wonderful
> progress [i]n his academics.  He just completed taking the PSAT and SAT, due to
> the guidance office recommending he take them. K[.O.] has lost over 100 lbs . . . .
> K[.O.] was able to participate in the golf program and is currently on the
> cheerleading squad for the School basketball team.  The Counseling office advised
> us that K[.O.] was making great strides in group counseling and 12 step meetings.
> The Family School Social Worker has been available to K[.O.] on a as needed basis
> for individual counseling.  In light of K[.O.]'s emotional difficulty in the past 2
> months, I have asked the Family School to make arrangements for K[.O.] to receive
> weekly individual counseling by either Susan Runge MSW or Renee Gotthardt
> MSW.  I would also like to have you follow him on a regular basis, perhaps
> monthly for Cog[nitive] and Behavioral Psychotherapy to address his negative
> emotions.

Ex. 38.

In a report dated December 12, 2004 Dr. Fras changed K.O.'s diagnosis from oppositional

defiant disorder to oppositional defiant disorder, severe.  Ex. 27.

Psychologist Brain began counseling K.O. in January 2005 after receiving a referral from

K.O.'s family leader.  T.373.  According to Brain, K.O.:

> was having great difficulty managing his anger and managing his attitude toward his
> peers, towards schoolwork.  He was underperforming, appeared to be very sullen,
> sulky and disconnected from what was important for his progress and movement
> forward.  They had concern about the length of time that he had been here at the
> school and not made any appreciable progress with his program, which is his

12

understemming of his issues and problems and pragmatic work towards resolving those.

*Id*.  In a counseling noted dated January 10, 2005, Brain stated that K.O.:

> has no real strategies for dealing with his anger except to report that he "tries to let things go".  His rationale for his behavior was that "I'm a baby if I don't get my way".
>
> Although there is opportunity to work with [K.O.], minimally on assisting with expanding and developing anger management skills, I didn't get the sense that he was willing or ready for this.

Ex. 39.  After this counseling session, Brain testified that it was:

> clear to me that K was an individual who needed to do some work, some counseling, therapeutic work on that.  What I was questioning, however, is K's commitment to work on that or his readiness really to do some serious work that had a foundation in the fact that he had represented himself that he had not been forthcoming with Dr. Fras.

T. 380.

In a letter dated February 5, 2005, to Dr. Charles Moss, a consulting psychologist for the

Family Foundation, K.O.'s father wrote:

> I am requesting that you re-evaluate my son . . . for your special group counseling sessions.  Dr. Fras recently re-evaluated him only to find him still to be very defiant.  Since K[.O.] continues after 22 months at Family School, to have negative emotions, I feel I need to advocate for him to get regular group counseling with either yourself, Susan Runge, or Renee Gotthardt.  If he has been receiving such counseling from yourself or the Social Workers, I would appreciate something in writing explaining K[.O.]'s counseling sessions with you and how often.

Ex. 42.

Gotthardt wrote a letter dated February 15, 2005, per plaintiffs' request, to advise the

District that K.O. was:

> attending weekly individual counseling sessions with our consulting psychologist, Jeff Brain, M.S.  The sessions are forty-five minutes in length and cover issues related to daily struggles, cognitive restructuring as it applies to [K.O.'s] emotional and behavioral well-being, and anger management.  Concurrently, he has the opportunity

> to [meet with] either of our social workers as the need arises in conjunction with his
> sessions with Mr. Brain.

T. 275-76,  Ex. 43.

Counseling notes indicate that Brain met with K.O. eight times between January 10, 2005,

and April 27, 2005.  Exs. 39, 40, 41, 56.   Brain stated that the outcome of the therapy  was a

noticeable improvement in K.O.'s willingness to engage in the therapy process, as well as

improvement in K.O.'s emotional and behavioral maturity.  T. 391.  Brain further stated that K.O.

initiated on his own to speak with Brain.  T. 397.

In a letters dated March 7, 2005 and April 4, 2005, Race requested that the Family

Foundation forward all records regarding K.O.'s academic, behavioral and social functioning for

K.O.'s annual review.  Exs. 12, 15, T. 64.  In response, Race received medical information, letters

from Renee Gotthardt, notes from Dr. Fras, T. 64, and recent teacher summaries.  T. 64, Ex. 15.

In a summary dated April 7, 2005, K.O.'s Spanish III teacher commented that he did not

give "100%" to class participation, was reserved with adults, "seems to get along" with peers but

"seems to choose those he wants to engage with."  K.O.'s teacher stated that although his

academic performance was at grade level, he was capable of more "if he would put forth the

effort."  Ex. 23.

In a summary dated April 7, 2005, K.O.'s United States history teacher commented that

K.O.'s behavior in her class was "good".  *Id.*

In a summary dated April 7, 2005, K.O.'s biology teacher commented that he completed

his homework and received good grades, but "can get distracted and needs to be refocused on

class discussion".  *Id.*  The teacher stated that K.O. was "respectful" with adults and performed at

grade level, but "likes to act like the class clown".  *Id.*

In a summary dated April 7, 2005, K.O.'s English teacher, Barbara Thorbjornsson indicated that K.O.'s attendance, homework completion, and classroom behavior were "good". *Id*. Thorbjornsson stated that K.O. was "very quiet" in class, but performed "higher than grade level". *Id*. Additionally, Thorbjornsson commented that K.O. was "a very quiet, introverted young man. Sometimes, I become worried because he seems like a time bomb. He has this under tow of anger that sometimes 'shows' itself in his voice." *Id*.

In a summary dated April 7, 2005, K.O.'s math A3 teacher stated that he completed his homework, participated in class discussions, but "barely perform[ed] at grade level". *Id*. The teacher commented that K.O. had "a difficult time interacting with adults without giving an attitude" and that he, at times, "intimidate[d] his peers". *Id*. The teacher further stated that K.O. "has the potential to be an excellent student" but "he lets his attitude get in the way". *Id*.

In a letter dated April 12, 2005, Race advised plaintiffs that a CSE meeting was scheduled for May 6, 2005. Ex. 17. In a letter to the Family Foundation dated April 13, 2005, Race requested that one of K.O.'s teachers and his counselor be available to participate in the CSE meeting scheduled for May 6, 2005. Ex. 18. Race also wrote a letter to K.O., dated April 12, 2005, to advise him of the annual review and to invite him to participate in the CSE meeting. Ex. 16. Race testified that the District encouraged all secondary students to participate in developing their IEPs, and also, the District wanted K.O. "to help us with the transition planning piece of the IEP", including career planning. T. 67. Along with the letter, Race sent a password to "the career zone" website for K.O.'s use. *Id*.

Race testified that although she received no response from K.O., Vicky Kravetsky, the Family Foundation guidance counselor, informed her that the letter had been received, and that

"they open all mail that goes to students and that at this point in time they were not going to allow him to do the career planning thing.  He was not allowed to be on the computer, he was not allowed any Internet access."  T. 68.  According to Race, Kravetsky explained that K.O. "was being very defiant, they were having a lot of disciplinary problems with him at that point in time. She said he had been moved from one family to another because he was not making the progress they hoped he would make."  *Id*.

Kravetsky, in a letter dated April 26, 2005, formalized the Family Foundation's position. Ex. 19.  Specifically, Kravetsky wrote that K.O. was "refusing to work through his current difficulties, and it would be counterproductive for [him] to focus on the future."  *Id*.

Race testified that prior to the CSE meeting, through a phone conversation with Kravetsky, she learned that:

> there was a lot of difficulty with [K.O.] being defiant, the anger, that they had to move families.  So in order to prepare for the IEP's social-emotional piece, I thought it would be good for me to talk to [Jeff Brain] to find out what we needed to consider as a committee under the first social-emotional growth.

T. 71.

Race testified that she contacted Jeffrey Brain on or about April 28, 2005, who informed there that there were "some real serious behavior problems" and defiance, and that, as a result, K.O. had been put on sanctions.  T. 72, 74.  Race stated that she asked Brain what progress K.O. had made in the two years he had been there, and that Brain responded that he felt that other than being less physically aggressive, K.O. had not made any progress.  T. 72.   Race testified that Brain further informed her that K.O. "was very angry with the adults at the program", "that he was chronically dishonest", and that "he had difficulty taking responsibility for his actions."  T. 73.

In a letter dated May 1, 2005, Race wrote the Office of Mental Health to advise that one of the District's students was "at risk of a future placement in a residential school" and requested that the agency make recommendations regarding the appropriateness of residential placement and any other programs and placement alternatives.  Ex. 21.  Race testified that based on her conversations with Kravetsky and Brain, she felt that the CSE should consider a residential facility for K.O.  T. 189.

On May 10, 2005, the CSE met to prepare an IEP for the 2005-2006 school year.  An attendance sheet indicated that plaintiffs, Race, the school psychologist , a special education teacher, a regular education teacher, a social worker, a parent representative, Ellen Mahanna, and the parties' attorneys were present.  Ex. 24.  Brain, Kravetsky, and Thorbjornsson, from the Family Foundation, attended by phone.  Ex. 24, T. 85.

According to Race, Kravetsky stated that K.O.'s grades were inconsistent, and varied each month, but that he was passing all of his courses and completing homework.  T. 85.  Brain testified that at the meeting, he advised the CSE that K.O.'s peer relations were poor, and his social interactions were very limited and superficial.  T. 400-01.  Brain stated that he also informed the CSE that K.O. presented with a sullen and depressed look, that he was calculated, and that he was obsessed with girls.  T. 401-02.  Brain advised the CSE that K.O.'s anger management needs had not yet been addressed, and that K.O. had a number of sanctions.  T. 402.  Brain told the CSE that K.O. was resistant to counseling and that he needed regular therapeutic intervention, on a weekly basis if possible.  T. 403.  Brain also informed the CSE that K.O. was engaged in a power struggle involving the "family leader" of family two, into which he recently moved from family one.  T. 405.

17

The CSE discussed whether the Westmoreland BOCES program could address K.O.'s disabilities, but Mahanna, who was at the meeting, stated that she did not believe the program could meet K.O.'s needs.  T. 104, 450.  Mahanna testified that after hearing updates from the Family Foundation staff about K.O.'s behavior, she "just felt as though he needed more support than we could give him in the adjustment program."  T. 450.  Race testified that "[b]ased on the information Jeff Brain had given about his severe behavioral disabilities",  T. 104, the CSE recommended that K.O. be placed in a New York State approved residential placement.  T. 107-08.[6]

Race subsequently contacted Roland Smiley, the New York State Education Department representative for residential placements for advice about an appropriate facility for K.O.  T. 108.  Smiley recommended Devereux Fenwood Service.  *Id.*

Janet McNealis, the education director for the Beneto program at the Devereux Foundation testified that Devereux is "a private nonprofit organization that deals with children and adults with disabilities."  T. 491.  McNealis stated that the Beneto program "is an offshoot program that primarily specializes in children and youth adolescents between the ages of approximately six to eighteen."  *Id*.  McNealis stated that the Brandywine campus has an elementary and a secondary school.  T. 493.  McNealis testified that there are 72 students in the secondary program.  *Id*. McNealis stated that students do not earn New York State Regents diplomas there, but that staff at Devereux helped prepare students to take the tests, and those students will return to New York State to take the tests.  T. 494-95.  McNealis stated that students

---

[6]The Family Foundation is a registered New York State boarding school, but is not approved as a special education facility.  Proceeding I, T. 989.

at the secondary level are divided into classes of twelve, with one certified special education teacher and one teacher assistant. T. 495. According to McNealis, the classes are self-contained and divided "based on academic ability levels and age range." *Id*. Counseling and family therapy are also provided after school hours. T. 496. If a student was having an issue, however, a therapist would be available in the school to meet with him. T. 499. McNealis testified that the qualifications for "primary therapists" are "anywhere from licensed social workers, master level and PhD level." *Id*.

McNealis testified that a psychiatrist is on campus "every day of the week" and that every student is assigned to a psychiatrist who is with the student during his entire stay. T. 505. McNealis testified that although she was not familiar with the requirements for counselors, "[t]hey normally are people who are college graduates with at least a bachelor's degree in ideally social services or something along those lines." T. 506-07. The counseling provided in school, however, is by licensed social workers. T. 507-08. McNealis testified that the Brandywine campus is all male. T. 508. Devereux is licensed by the Pennsylvania Department of Education as a primary academic school and is accredited by joint commission meaning that it is "a mental-health-hospital-based accreditation in the State of Pennsylvania". T. 509-10.

Race submitted K.O.'s current evaluation information to Devereux. T. 109. In a letter dated June 8, 2005, John Mogaka from Devereux Beneto Center advised Race that K.O. would be accepted to the program and requested a number of documents. Ex. 26. Mogaka also sent this letter to plaintiffs. *Id*.

K.O.'s mother testified that she agreed with the recommendation of residential placement, T. 592, but that rejected Devereux, and believed K.O. should be placed at the Family Foundation.

*Id.* K.O.'s mother explained that K.O. had been at Devereux for two weeks in 2001, and plaintiffs "found it to be an inappropriate program." T. 595. K.O.'s mother testified that she did not fill out the paperwork for Devereux or visit Devereux as the District had requested because she had already been there and plaintiffs were "going to leave him in the Family School. He was doing very well." T. 598.

After receiving the acceptance letter from Devereux, Race scheduled a CSE meeting for July 11, 2005 to discuss residential placement at Devereux. T. 113. K.O.'s mother, Race, the school psychologist, a special education teacher, a parent representative, the parties' attorneys, and John Mogaka from Devereux were present. Ex. 30. A regular education teacher was not at this CSE meeting. T. 215-216.

At the July 11, 2005 CSE meeting, plaintiffs' attorney asked Mogaka, an admissions coordinator at Devereux, a series of questions regarding how many buildings comprised the Fenwood program, the number of students in each building, the number of counselors present at midnight, the name of the psychiatrist at Fenwood, the number of licensed social workers present during the day, Regents exams for New York State credit, the proportion of Devereux students that attend college, and the distance between Devon, Pennsylvania and Utica, New York, where plaintiffs resided. T. 544-47. Mogaka did not know the answers to these questions. *Id.*

Race testified that the CSE discussed the Devereux program during the meeting, and that in her opinion, the Devereux program could meet K.O.'s needs because it had "[t]he intensive counseling, therapeutic counseling piece, which was what Jeff Brain was saying [K.O.] needed. And they had counselors available in the residence full time and at the school program." T. 117.

Plaintiffs, through their attorney, objected to the IEP, informed the CSE that they planned to keep K.O. at the Family Foundation, and preserved their right to pursue tuition reimbursement. Ex. 30.

The IEP the CSE issued for the 2005-2006 school year[7] recommended that K.O. be placed at Devereux Brandywine - Fenwood. Ex. 31. The IEP indicated that K.O.'s grades were "within average range" but that "[s]ocial and emotional difficulties are interfering with academic performance as evidenced by fluctuating and inconsistent grades." *Id*. Regarding K.O.'s social development, the IEP stated that his "peer relations are limited and on a superficial level. He does not display appropriate coping skills. His oppositional behavior interferes with his peer relationships. He engages in power struggles with adults." *Id*. Regarding K.O.'s management needs, the IEP stated that a "functional behavioral assessment and a behavior plan need to be completed." *Id*. The IEP further stated that K.O. "needs to develop and utilize anger management strategies. He continues to require a structured environment." *Id*.

The IEP recommended that K.O. have group counseling once weekly and individual counseling twice weekly. *Id*. The IEP further recommended testing accommodations. *Id*. The IEP set goals for K.O. regarding the identification and integration of positive personal attributes and strategies for "appropriate interactions with peers", strengths "that he can utilize to manage his anger", and strategies "to become independent in his learning." *Id*. The IEP  contained a goal related to the demonstration of "appropriate classroom behavior". *Id*. The IEP indicated that the "Credential/Diploma Sought" is a "Local high school diploma" *Id*. Finally, the IEP stated that

---

[7]The IEP indicated that K.O.'s "current grade" level was "11". Ex. 31.

K.O. planned "to attend college and further his education, he will explore various careers and interests with the counselor." *Id.*

K.O.'s mother testified that she rejected the 2005-2006 because she did not want K.O. to go to Devereux.  T. 593.  K.O.'s mother stated that the grades in his IEP were "incorrect" and she did not agree that his "peer relations" were limited because K.O. had a lot of friends.  T. 594.  K.O.'s mother explained that she was opposed to Devereux because K.O. had spent two weeks there in 2001, and she found the program to be "inappropriate".  T. 594-95.  According to K.O.'s mother, Devereux lacked a recreational program, at the time, no education going on, and the children there were "sitting around watching television".  T. 597.  K.O.'s mother stated that despite "some ups and downs", K.O. had "made tremendous progress" at the Family Foundation.  T. 599.  K.O.'s mother testified that she had no intention of him leaving the Family Foundation.  T. 601.

Plaintiffs requested an impartial hearing to address the District's alleged failure to provide a free appropriate public education for the 2004-2005 and 2005-2006 school years and sought an order directing the District to reimburse them for the tuition and costs associated with K.O.'s Family Foundation attendance.

To challenge their child's IEP, a parent may seek an "impartial due process hearing" before an impartial hearing officer ("IHO").  20 U.S.C. § 1415(f); N.Y. Educ. Law § 4404(1).  The school district or the parent, may appeal the IHO's decision to a state review officer ("SRO").  N.Y. Educ. Law § 4404(2).  Either party "aggrieved by the findings and decision" made by the SRO may bring a civil action in state or federal court.  20 U.S.C. § 1415(i)(2)(A).

A hearing concerning the 2004-2005 and 2005-2006 school years before the IHO began on July 14, 2005 and concluded on October 24, 2005, after five days of testimony.  CSE Chairperson Lynda Race, Ellen Mahanna from Oneida County BOCES, Janet McNealis and John Mogaka from the Devereux Foundation, Renee Gotthardt, Victoria Kravetsky, Sidney Parham, Barbara Thorbjornsson, and Jeffrey Brain from the Family Foundation, K.O.'s mother, and the District's expert, Frank Doberman Ph.D., testified.  In addition to the testimony set forth above, several of these witnesses testified regarding K.O.'s condition at the time of the hearing, and offered their opinion regarding the appropriate placement for K.O.

Gotthardt stated that weekly group therapy sessions are "peer counseling sessions" and "consist of six to ten students and last about an hour and a half."  T. 262.  Gotthardt stated that these sessions are facilitated by a staff member who is supervised by either herself or the other social worker, Susan Runge.  *Id.*  According to Gotthardt, the staff member facilitating K.O.'s group at the time of her testimony, was Marie Scozzari, who has a bachelor's degree in psychology and a Master's degree in public health.  T. 264.  Prior to Scozzari, Sharon Dixon was K.O.'s group facilitator.  T. 265.  Gotthardt did not know Sharon Dixon's credentials.  *Id.*  According to Gotthardt, Family Foundation students do not receive test modifications.  T. 292.

Gotthardt testified that K.O. never had any incidents involving physical aggression toward Family Foundation students or staff members.  T. 276-77.  Gotthardt opined that K.O. should remain at the Family Foundation because he had made "significant progress" and although "he has struggles" he was working "near his potential":

> I think emotionally he's starting to find some stability, not so much the roller coaster
> sort of emotional instability that he had before.  He's reconnecting with his family in
> a very healthy and positive way.  I know that his parents and his brother were here

recently for a group and for a visit and he's learning how to communicate with them openly.  He's maturing . . . .

So I think on all fronts he's made progress.  There's been no substance use since his enrollment.  He still has some issues relating appropriately to the opposite sex.  His impulsivity is certainly more under control but I think all around, things have progressed in a positive direction.

T. 278-79.

Sidney Parham, Ph.D., academic vice president at the Family Foundation, T. 322, testified that he is the leader of family two, of which K.O. was a member at the time of the hearing.  T. 325.  Dr. Parham stated that K.O. is "quick to anger if told what to do and he doesn't want to do it.  He is much . . . better about it.  He's much less impulsive than that, but he was quick to do that."  T. 328.  According to Dr. Parham, K.O. "is an extreme introvert.  He seems not to have good social skills and the anger and the oppositional things seem to be part of that, and I am, by training, not a psychologist." *Id*.  Dr. Parham stated that, at present, K.O. is more open and willing to talk.  T. 330.  Dr. Parham testified that he believed K.O. needed to remain at the Family Foundation because "he needs practice in the skills he is acquiring" and "he can learn more skills in anger management" and it would cause K.O. emotional stress to transfer to another school during his senior year.  T. 338.

Barbara Thorbjornsson, K.O.'s English 11 teacher, T. 347-48, testified that K.O. is "incredibly quiet" in class, but responded to direct questions.  T. 352.  Thorbjornsson stated that K.O. has no behavioral issues in class and that she has never seen him laughing or joking with another student.  Thorbjornsson testified that she believed K.O.'s  "lack of seeming connectedness with anybody is an issue."  T. 354.  Thorbjornsson stated that K.O. performed at "a fairly high level" as long as "the questions are very clinical and it's true-false or matching" but

24

that he had difficulty relating things to his own life.  T. 355.  Thorbjornsson stated that K.O.

completed assignments and homework for her class.  T. 358.

Brain testified that the Family Foundation planned to begin an anger management group

in July or August 2005 and that K.O. had enrolled.  T. 393.  Brain stated that the group would

meet twice monthly for four months.  *Id*.

Brain testified that he did not think it would be of "any essential benefit" for K.O. to

transfer to Devereux.  T.422.  Brain explained that K.O. is:

> in a therapeutic residential boarding school who in my opinion has accurately
> assessed what his issues are, his problems are, and has a structure and a format that
> will allow K to remediate those issues.  It certainly has an academic component to it
> that's challenging but appropriate for K; that will allow him to move onto further his
> education.  So I think on all fronts it's meeting his need therapeutically, meeting his
> need academically and, therefore, a good fit.

*Id*.

Brain testified that the "bulk" of K.O.'s progress had been in the "past six months", *i.e.*

since in or about January 2005, but explained that the two years it took for K.O. to progress is

"reflective of the level of K's disturbance".  T. 425, 423.

 K.O.'s mother testified that she believed it would have been "inappropriate" to move

K.O. to Devereux because he was "adjusted into a program", K.O. was "unhappy at Devereux",

and moving him "to a place to start all over again with all new people would have been

traumatizing to him again" and it would be a hardship on his family to see him because Devereux

was more than six hours away.  T. 622.

K.O.'s mother testified that in September 2005, K.O. had a home visit and that they "had a

wonderful time" and K.O. "enjoyed being home."  T. 807.  K.O.'s mother stated that plaintiffs

also took K.O. on a tour of Binghamton University.  T. 806-07.   K.O.'s mother further stated that he "is currently filling out applications" for college.  T. 808.

Frank J. Doberman, Ph.D., a licensed New York State psychologist, testified on behalf of the District.  T. 703.  Dr. Doberman did not evaluate K.O., but reviewed his psychiatric and psychological reports.  T. 718.  Dr. Doberman testified that in his private practice, he provides individual and group counseling to adolescents.  T. 706-07.  Dr. Doberman further stated that he had provided counseling to students diagnosed with mood disorders and oppositional defiant disorder.  T. 707.  Dr. Doberman also provided consultations to school districts and parents working with school districts.  *Id.*

Dr. Doberman testified that he was familiar with the Alcoholics Anonymous twelve-step program as a recognized approach for issues of addictive behavior.  T. 708-09.  Dr. Doberman explained that it is run by lay individuals and is not considered psychotherapy.  T. 709.  Dr. Doberman stated that the twelve-step program is a recognized approach for adolescents and could be "one element of a comprehensive program" to address mood disorders.  T. 712.  Dr. Doberman explained that it was "not sufficient to address mood disorders solely" because "its primary emphasis is on changed behavior patterns.  And the issue of mood and the issue of sadness would lend themselves to both group process, individual process, pharmacological interventions, so . . . it would join with an appropriate number of different modalities."  T. 713.  Dr. Doberman stated that although anger issues could be addressed through the twelve-step program, it was not alone sufficient.  *Id.*  Dr. Doberman testified that the twelve-step program could be used to address oppositional defiant disorder but that "[a]n individualized behavioral plan, behavior improvement

program, addressing both the antecedents, the behaviors and the consequences of the behavior would be necessary."  T. 713-14.

Dr. Doberman testified although a twelve step program could "be effective in working on elements of [K.O.'s] behavioral program" it was not sufficient "in the area of mood disorders" because the record did not indicate that the skills he developed in "that environment" "under a high degree of structure" would "generalize . . . with his parents outside of that environment."  T. 729-30.  Dr. Doberman believed that K.O. needed medically based services "to understand if there's any ongoing implications of the adrenal cortical hyperplasia"[8] and "to review if the current pharmacological approaches are effective."  T. 730.

Based on his review of the information in the record, Dr. Doberman opined that the Family Foundation did not provide the positive reinforcement that K.O. needed, but instead emphasized "negative consequences and sanctions."  T. 725.  Dr. Doberman stated that an anger management group would be appropriate to address K.O.'s anger management issues, but not alone sufficient.  T. 728.  Dr. Doberman testified that he believed the Family Foundation "would be able to impact" K.O.'s mood disorder, but that K.O. needed "a broad general approach utilizing psychological, psychotherapy, [and] psychiatry services".  T. 732.  Dr. Doberman testified that in his opinion, providing counseling for K.O. seven times over the course of five or six months "would seem to me to be very hard to develop consistency, to develop a relationship with him, to reinforce the behaviors which you're seeking at that degree of limited counseling."

---

[8] At age seven, K.O. was diagnosed with congenital adrenal hyperplasia for which he received steroid treatment under the care of an endocrinologist.  As a result of this condition, at age 12, K.O.'s bone age was equivalent to that of a 17 year-old.  K.O.'s endocrinologist directed that K.O. discontinue the steroid treatment the summer before K.O. entered seventh grade.

T. 797-98.  Dr. Doberman stated that he believed the Family Foundation was "meeting part of his needs" but was not "meeting his needs to reintegrate into his family, to reintegrate into society in general."  T. 732.  Dr. Doberman testified that his "most significant concern" about the Family Foundation was whether K.O. was internalizing new behaviors and whether those behaviors would carry through to other environments.  T. 777.

Dr. Doberman testified that he believed K.O. needed residential placement during the 2005-2006 school year and, indeed, needed residential placement every year since 2001.  T. 769.  Dr. Doberman testified that if he were a member of the CSE, he would have recommended that K.O. be placed in a highly structured educational program with access to positive and negative interactions with staff.  T. 730.  Dr. Doberman further stated that such a program should have an "environment in which [K.O.] will desire to put out positive behavior and therefore his competencies can be reinforced, one in which there is a high level of social work or psychological counseling involved, one in which the parents have an opportunity to integrate themselves to the fullest extent possible with his life in that program."  T. 730-31.

Regarding individual counseling, Dr. Doberman testified that he believed K.O. "would profit from counseling at least once to twice a week, or with a consistent frequency."  T. 726.  Dr. Doberman opined that K.O. should also receive group counseling at least once a week "to work on general issues of impulse control, social skills as well as anger management."  T. 725-26.  Dr. Doberman stated that because of K.O.'s "very complex needs" and because "mentally he is a very difficult child at times in his behavior" K.O. "needs a high level of expertise in terms of licensed or certified social workers or psychologists able to see him on a regular basis . . . for counseling."  T. 731.  Dr. Doberman explained that the expertise was important because "the level of

sophistication he shows, his intellectual ability, I believe that he is highly complex and someone needs to be experienced to work with him." *Id.*

## III.   ADMINISTRATIVE DECISIONS

### A.   Impartial Hearing Officer

The IHO found that the District failed to offer K.O. a free appropriate public education for the 2004-2005 and 2005-2006 school years and that once the Family Foundation began providing individual counseling to K.O. on January 10, 2005, it became an appropriate placement. Accordingly, the IHO awarded plaintiffs reimbursement for the cost of tuition from January 10, 2005 to the end of the 2005-2006 school year.

Specifically, the IHO found that the 2004-2005 IEP was inadequate because the goals and objectives it contained were, with one exception, identical to the goals and objectives contained in the 2003-2004 IEP, which both the IHO and first SRO found inadequate and vague in Proceeding I.  The one exception was that the 2004-2005 IEP contained a goal which stated that K.O. "will demonstrate appropriate study skills in the content areas" and two corresponding objectives that K.O. "will complete guided review sheets one day prior to the scheduled exam" and "will demonstrate the ability to utilize graphic organizers to organize content area information."  Ex. 11.

The IHO further found that the District's failure to procure the attendance of a regular education teacher at the July 11, 2005 CSE meeting rendered the 2005-2006 IEP a nullity.  IHO Decision, p. 9.  The IHO noted that there was a regular education teacher present at the May 10, 2005 CSE meeting, but found that a regular education was not present at the meeting during which the CSE decided to place K.O. at Devereux, an out-of-state placement, with no regular

education classes, would have been helpful "in determining appropriate positive behavioral interventions and strategies and what program modifications and supplementary supports are necessary in the general education environment".  IHO Decision, p.10.  Finally, the IHO explained, because K.O. received no special education services at the Family Foundation, a regular education could have "sp[oken] to the necessary modifications and supplementary aides that the Student might need in the classroom."  *Id*.

Regarding the appropriateness of plaintiffs' placement of K.O. at the Family Foundation, the IHO found "on balance" that "the program offered by the F. School was designed to provide a benefit."  IHO Decision, p.11.  The IHO acknowledged the "abundance of negative reports" regarding K.O., but found "that to be a function of the Student's individual characteristics and not a lack of beneficial programming."  *Id*.

The IHO noted that the Family Foundation specialized in educating students with emotional and behavioral problems and that it had "rigorous academics" and utilized New York State Regents courses.  *Id*.  The IHO further noted that the Family Foundation made staff available twenty-four hours a day and had psychologists and psychiatrists available "on a consultant basis."  *Id*.  The IHO discussed the Family Foundations' use of "a cognitive behavioral approach" as well as the twelve-step program.  *Id*.  The IHO credited plaintiffs' submissions and testimony regarding the "wonderful" and "incredible" progress K.O. had made and found that the Family Foundation "was designed to provide a benefit".  *Id*.

After balancing the equities, the IHO found that the District was responsible for the cost of tuition at the Family Foundation from January 10, 2005, the date K.O. first received counseling from Jeffrey Brain, until the end of the 2005-2006 school year.  IHO Decision, p.12.

The District appealed the IHO's decision and plaintiffs cross-appealed so much of the IHO's decision as denied their request for tuition reimbursement from September 2004 through January 10, 2005.  SRO Decision, p.8.

**B.      State Review Officer**

State Review Officer Paul Kelly[9] agreed with the IHO's determination that the 2004-2005 IEP was inadequate.  *Id*.  The SRO found that it did "not accurately reflect how the student performs or adequately describe[] the student's needs".  SRO Decision, p.9.  Specifically, the SRO stated that the IEP did not reflect K.O.'s anger and how it affects his behavior and educational and social development.  *Id*.  The SRO also found the IEP contradictory to the extent it indicated, in the section describing his social development, that K.O. "generally gets along well with his peers", but then stated under the management section that he needs to improve peer relationships.  SRO Decision, pp.9-10.  The SRO explained that "[t]hese descriptions minimize the degree and intensity of the student's emotions and behaviors and their subsequent impact on his academic and social performance" and that the record "indicates that the student's needs were more significant and intense than what the IEP actually reflects."  SRO Decision, p.10.  Thus, the SRO concluded, the goals and objectives in the 2004-2005 IEP were inadequate and vague and did not "provides sufficient guidance to the student's teachers and parents with respect to the CSE's expectations for the student's performance".  *Id*.

Turning to plaintiffs' placement of K.O. at the Family Foundation for the 2004-2005 school year, the SRO found that it was not an appropriate placement for reasons "similar to those" set forth in the SRO's decision following the first hearing regarding the 2002-2003 and 2003-

---

[9]SRO Kelly was the SRO in Proceeding I.

2004 school years.  SRO Decision, p.11.  The SRO agreed that the Family Foundation's program did not meet K.O.'s behavioral and emotional needs and found no evidence in the record to suggest that the Family Foundation's program from September 2004 through January 10, 2005, differed materially from the program in place during the 2003-2004 school year.  *Id*.

The SRO cited evidence indicating that K.O.'s primary area of need was "social-emotional" and noted that no staff member "who assumed the role of counselor during the 'family session'" had any "certifications in any field" and that K.O. received no individual counseling, special education instruction, or test modifications.  *Id*.

Further, the SRO disagreed with the IHO's conclusion that the "Family Foundation became an appropriate placement upon implementation of counseling services on January 10, 2005."  *Id*.  The SRO noted that K.O. began receiving individual counseling as a result of plaintiffs' "specific requests" after K.O. was "violent toward himself and another student".  *Id*. Additionally, the SRO explained, K.O.'s family leader referred K.O. to Brain in January 2005 for counseling because K.O. was having difficulty with anger and managing his attitude toward peers and schoolwork, and was underperforming, sullen, sulky, and "'disconnected from what was important for his progress and movement forward'".  SRO Decision, p. 12 (quoting T. 373).  The SRO also relied on Brain's testimony that there was "concern about the length of time that he had been here at the school and not made any appreciable progress with his program".  *Id*. (quoting T. 373).

The SRO noted that K.O. received at most eight individual counseling sessions over the course of seven months, and then only at his own initiative.  SRO Decision, p. 12.  The SRO was also concerned about the psychologist's failure to read the 2003 psychological evaluation by Dr.

Jason Hans, or to speak with Dr. Fras, consulting psychiatrist while he was providing counseling

to K.O.  *Id.*  Finally, the SRO cited the psychologist's own opinion that K.O. required regular

therapeutic intervention and that weekly counseling was preferred.  SRO Decision, p. 12.  Thus,

the SRO concluded that the "limited 'individual counseling'" did not transform the Family

Foundation into an appropriate placement.  *Id.*

       The SRO next addressed the 2005-2006 IEP and disagreed with the IHO's conclusion that

the absence of a regular education teacher at the July 2005 CSE meeting invalidated the IEP.  *Id.*

The SRO explained that because a regular education teacher had been present at the May 10,

2005 CSE meeting when the CSE discussed K.O.'s classification, "present levels of performance,

supplementary aids and services and program modifications and supports, testing

accommodations, participation in general education, related services, and goals and objectives"

and met on July 11, 2005 to discuss K.O.'s potential placement at Devereux, no regular education

teacher was required.  SRO Decision, p. 13.

       The SRO further found that the 2005-2006 IEP accurately reflected the reports of Family

Foundation staff regarding K.O.'s progress, and contained an accurate description of K.O. and his

progress at the Family Foundation.  *Id.*  The SRO noted that the IEP included information about

K.O.'s peer relationships, oppositional behavior, and need to develop strategies for anger

management.  *Id.*  The SRO noted that the goals and objectives described needs identified in

previous IEPs, but that they had been expanded and clarified, and reflected K.O.'s  needs "as

articulated in his present performance levels".  *Id.*  The SRO also found that the CSE had added a

number of objectives which were "more specific and include more detailed criteria by which

progress can be monitored." *Id.* Accordingly, the SRO found that plaintiffs were not entitled to reimbursement for tuition expenses. This action followed.

## IV.    DISCUSSION

Summary judgment is appropriate where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(c). Substantive law determines which facts are material; that is, which facts might affect the outcome of the suit under the governing law. *See Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 258 (1986). Irrelevant or unnecessary facts do not preclude summary judgment, even when they are in dispute. *See id.* The moving party bears the initial burden of establishing that there is no genuine issue of material fact to be decided. *See Celotex Corp v. Catrett*, 477 U.S. 317, 323 (1986). With respect to any issue on which the moving party does not bear the burden of proof, it may meet its burden on summary judgment by showing that there is an absence of evidence to support the nonmoving party's case. *See id.* at 325. Once the movant meets this initial burden, the nonmoving party must demonstrate that there is a genuine unresolved issue for trial. *See* Fed. R. Civ. P. 56(e). A trial court must resolve all ambiguities and draw all inferences in favor of that party against whom summary judgment is sought, *see Ramseur v. Chase Manhattan Bank*, 865 F.2d 460, 465 (2d Cir. 1989); *Eastway Constr. Corp. v. City of New York*, 762 F.2d 243, 249 (2d Cir. 1985).

### A.    First Cause of Action:  IDEA

In their first claim for relief, plaintiffs allege the District violated the IDEA by failing to provide K.O. with a free appropriate public education and seek reimbursement for K.O.'s tuition

and expenses at the Family Foundation for the 2004-2005 and 2005-2006 school years.  As the

Second Circuit has noted:

> a motion for summary judgment in an IDEA case often triggers more than an
> inquiry into possible disputed issues of fact. Rather, the motion serves as a
> "pragmatic procedural mechanism" for reviewing a state's compliance with the
> procedures set forth in IDEA and determining whether the challenged IEP is
> reasonably calculated to enable the child to receive educational benefits.

*Lillbask ex rel. Mauclaire v. State of Conn. Dept. of Educ.*, 397 F.3d 77, 83 n.3 (2d Cir. 2005)

(citing, *inter alia*, *Wall v. Mattituck-Cutchogue Sch. Dist.*, 945 F.Supp. 501, 508 & n. 6 (E.D.N.Y.

1996) (analogizing the role Rule 56 motions play in allowing courts to review administrative

determinations in IDEA cases to the role Rule 12(c) motions play in allowing administrative

review of Social Security determinations)).

   The role of the reviewing court in assessing the application of the IDEA's provisions to

the facts of a particular case is a mixed question of law and fact.  *See J.D. v. Pawlet Sch. Dist.*,

224 F.3d 60, 64 (2d Cir. 2000).  The Court's role in making this assessment is "circumscribed"

under the IDEA and the Supreme Court's decision in *Board of Educ. of the Hendrick Hudson*

*Cent. Sch. Dist. v. Rowley*, 458 U.S. 176 (1982).  "The responsibility for determining whether a

challenged IEP will provide a child with an appropriate public education rests in the first instance

with administrative hearing and review officers."  *Walczak*, 142 F.3d at 129.  Although their

"rulings are then subject to 'independent' judicial review", this "'is by no means an invitation to

the courts to substitute their own notions of sound educational policy for those of the school

authorities they review.'"  *Id.* (quoting *Rowley*, 458 U.S. at 205, 206).  Accordingly, when the

state hearing officer's review has been "thorough and careful", the court is "expected to give 'due

weight' to these proceedings, mindful that the judiciary generally 'lack[s] the specialized

35

knowledge and experience necessary to resolve persistent and difficult questions of educational policy.'"[10] *Id.* (quoting *Rowley*, at 206, 208) (internal quotation marks omitted).

The IDEA provides that the court "(i) shall receive the records of the administrative proceedings; (ii) shall hear additional evidence at the request of a party; and (iii) basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate." 20 U.S.C. § 1415(i)(2)(C).

To obtain retroactive reimbursement for the cost of private school, the parents must establish that: (1) the IEP the school district proposed was inappropriate; and (2) the private placement was appropriate to the child's needs. *See Burlington*, 471 U.S. at 370; *see also Gagliardo*, 489 F.3d at 112 ("The party who commences an impartial hearing . . .bears the burden of persuasion") (citing *Schaffer v. Weast*, 546 U.S. 49, 57-58 (2005)). Finally, even if the parents satisfy these two factors, the decision whether to award tuition reimbursement is within the Court's discretion. 20 U.S.C. § 1412(a)(10)(C)(ii) ("[A] court or a hearing officer may require the agency to reimburse the parents for the cost of [private] enrollment.") "It is well established that 'equitable considerations are relevant in fashioning relief' under the IDEA." *M.C. ex rel. Mrs. C. v. Voluntown Bd. of Educ.*, 226 F.3d 60, 68 (2d Cir. 2000) (quoting *Burlington*, 471 U.S. at 374).

     1.     **2004-2005 School Year**

          a.     **Adequacy of the IEP**

---

[10]Where, as here, the final state determination by the SRO conflicts with the earlier decision by the IHO, the Second Circuit has instructed that "the earlier decision may be afforded diminished weight." *Gagliardo*, 489 F.3d at 114, n.2 (citing *Karl v. Board of Educ.*, 736 F.2d 873, 877 (2d Cir. 1984)).

To obtain reimbursement for K.O.'s Family Foundation tuition and costs, plaintiffs must first show that the 2004-2005 IEP was inappropriate. To determine whether an IEP was appropriate, the Court "must assess (1) whether the state complied with the procedural requirements of the IDEA, and (2) whether the challenged IEP was 'reasonably calculated to enable the child to receive educational benefits.'" *P. ex rel. Mr. and Mrs. P. v. Newington Bd. of Ed.*, 546 F.3d 111, 118 (2d Cir. 2008) (quoting *Rowley*, 458 U.S. at 206-07).

An IEP must satisfy a range of detailed procedural requirements. The Second Circuit has held that a court must assess whether the IEP states:

> "(1) the child's present level of educational performance; (2) the annual goals for the child, including short-term instructional objectives; (3) the specific educational services to be provided to the child, and the extent to which the child will be able to participate in regular educational programs; (4) the transition services needed for a child as he or she begins to leave a school setting; (5) the projected initiation date and duration for proposed services; and (6) objective criteria and evaluation procedures and schedules for determining, on at least an annual basis, whether instructional objectives are being achieved."

*M.S.*, 231 F.3d at 102-03 (quoting *Walczak*, 142 F.3d at 122).

In this case, the SRO found that the 2004-2005 IEP did not accurately reflect the "degree and intensity" of K.O.'s needs, specifically, in the areas concerning his emotions and behavior, including his anger, or the extent to which they affected his academic and social development. Consequently, the SRO found, the goals and objectives were inadequate and did not provide sufficient guidance to plaintiffs or K.O.'s teachers regarding the CSE's expectations for K.O.'s performance.

The record supports the SRO's conclusion. The IEP reported that K.O.'s most recent grades "are all within the average range" and that although K.O. completed his homework, he

needed to be monitored.  Ex. 11.  The description of K.O.'s academic and learning characteristics, however, did not relate K.O.'s ongoing emotional and functioning problems, which, according to Gotthardt, included telling lies, and difficulties in motivation in the classroom.  Nor did the IEP indicate, as Gotthardt had stated in her letter prior to the CSE meeting, that K.O. was easily distracted and had difficulty determining appropriate behavior.

Regarding K.O.'s social development, the IEP reported that K.O. "generally gets along well with his peers . . . .  he is sensitive and likes to joke but, gets his feeling hurts [sic] when his peers joke with him . . . . his self-esteem has improved."  Ex. 11.  The IEP did not, however, indicate, that K.O. was, as Gotthardt pointed out in her letter, "socially immature" and still "attracted to a deviant lifestyle".

Finally, as the SRO pointed out, in reporting K.O.'s present levels of performance and needs, the IEP failed to relate K.O.'s difficulty with anger management and did not reflect K.O.'s diagnosis of oppositional defiant disorder, severe.  Indeed, minutes from the CSE meeting on June 23, 2004 to formulate the 2004-2005 IEP noted that K.O. becomes "sulky/angry" when confronted.  Ex. 10.

The evidence shows that the IEP minimized the "degree and intensity" of K.O.'s emotions and behaviors, and that the goals and objectives contained in the IEP were vague.  Thus, the IEP failed to provide sufficient guidance to teachers and plaintiffs regarding the CSE's expectations for K.O.   Indeed, the goals and objectives contained in the 2004-2005 IEP were in almost all respects identical to the goals and objectives in the 2003-2004 IEP, which was also found inadequate.  *See Omidian I*, Dkt. No. 27, pp. 40-44.  Thus, the Court defers to the expertise of the SRO on this issue and concludes that plaintiffs have established by a preponderance of the

evidence that the District failed to offer K.O. a free appropriate public education for the 2004-2005 school year.  *See Grim v. Rhinebeck Cent. Sch. Dist.*, 346 F.3d 377, 382 (2d Cir. 2003) ("[W]hether a procedural or a substantive issue-the sufficiency of goals and strategies in an IEP is precisely the type of issue upon which the IDEA requires deference to the expertise of the administrative officers.").

### b.    Unilateral Placement

Plaintiffs argue that the SRO erred in finding that their unilateral placement of K.O. at the Family Foundation was inappropriate for the 2004-2005 school year.  In *Frank G. v. Board of Educ. of Hyde Park*, the Second Circuit explained:

> No one factor is necessarily dispositive in determining whether parents' unilateral placement is reasonably calculated to enable the child to receive educational benefits. Grades, test scores, and regular advancement may constitute evidence that a child is receiving educational benefit, but courts assessing the propriety of a unilateral placement consider the totality of the circumstances in determining whether that placement reasonably serves a child's individual needs. To qualify for reimbursement under the IDEA, parents need not show that a private placement furnishes every special service necessary to maximize their child's potential. They need only demonstrate that the placement provides educational instruction specially designed to meet the unique needs of a handicapped child, supported by such services as are necessary to permit the child to benefit from instruction.

459 F.3d at 364-65 (citations and internal quotation marks omitted).

For the reasons stated in the SRO's decision concerning the 2002-2003 and 2003-2004 school years, and finding no evidence in the record to suggest that the Family Foundation's program "from September 2004 through January 10, 2005 differed in any manner from the program in place during the 2003-04 school year" the SRO found that the Family Foundation was not an appropriate placement.  The SRO cited evidence that K.O.'s primary area of need continued to be "social-emotional".  Further, despite evidence that K.O. needed individual

39

counseling by a professionally qualified counselor, the only counseling K.O. received at the

Family Foundation was through a "family session" with other students facilitated by a staff

member with no certifications in any field.  Indeed, psychologist Dr. Hans, who evaluated K.O. in

2003 had recommended that K.O. participate in weekly individual counseling with a qualified

professional.

 Plaintiffs argue that the progress K.O. has made, including his passing grades and

acceptance at Pace University, is evidence of the appropriateness of his placement.  Although "a

child's progress is relevant to the court's review . . . . such progress does not itself demonstrate

that a private placement was appropriate."  *Gagliardo*, 489 F.3d at 115.  As stated *supra*, the

Court must consider "the totality of the circumstances", including whether the placement provides

educational instruction "'supported by such services as are necessary to permit the child to benefit

from instruction.'"  *Frank G.*, 459 F.3d at 365 (quoting *Rowley*, 458 U.S. at 188-89). While K.O.

has achieved passing grades, there is little evidence of his emotional or behavioral progress

through the 2004-2005 school year.  Even K.O.'s father acknowledged K.O.'s "emotional

difficulties", "negative emotions", and ongoing defiance in his December 2004 and February

2005 letter requests to Family Foundation staff for psychiatric and psychological evaluations.  For

the reasons discussed extensively in the Court's prior Memorandum-Decision and Order, *see*

*Omidian I*, Dkt. no. 27, pp. 48-54, the Court again defers to the expertise of the SRO and

concludes that the Family Foundation was not an appropriate placement for K.O. from September

2004 through January 10, 2005.

 The SRO further found that implementation of individual counseling services with

psychologist Brain on January 10, 2005, did not make the Family Foundation appropriate.  The

40

SRO noted that the record indicated that in total, K.O. attended, at most, eight individual counseling sessions over the course of seven months.  As the SRO pointed out, however, even Brain specifically testified that regular therapeutic intervention and weekly counseling was preferable.  Moreover, there is no evidence that Brain familiarized himself with K.O.'s history by reading K.O.'s most recent psychological evaluation in 2003 by Dr. Hans or speaking with Dr. Fras, the consulting psychiatrist, at any point while providing counseling to K.O.  Finally, there is no indication in the record that K.O. would continue to receive individual counseling from Brain, on a regular, or even a sporadic basis.  Thus, the Court concludes that plaintiffs have failed to establish by a preponderance of the evidence that the Family Foundation provided the supportive services necessary for K.O. to benefit from instruction.

### 2.    2005-2006 School Year

Plaintiffs argue that the SRO erred in finding that the 2005-2006 IEP, which recommended placement at Devereux, provided K.O. a free appropriate public education.  Specifically, plaintiffs argue that they were denied their right to participate in the formulation of the 2005-2006 IEP because: the information presented at the CSE meeting regarding Devereux was inadequate; the CSE changed the designation of diploma from Regents to "local high school" without discussion; none of the goals in the IEP are measurable; and the CSE did not include a regular education teacher at the July 11, 2005 meeting.  Finally, plaintiffs argue that the District's failure to evaluate K.O. before recommending residential placement, violates the IDEA.

"The initial procedural inquiry is not mere formality . . . . 'adequate compliance with the procedures prescribed would in most cases assure much if not all of what Congress wished in the way of substantive content in an IEP.'"  *Walczak*, 142 F.3d at 129 (quoting *Rowley*, 458 U.S. at

206).  "[H]owever, it does not follow that every procedural error in the development of an IEP

renders that IEP legally inadequate under the IDEA."  *Grim*, 346 F.3d at 381.

In considering whether the District fulfilled IDEA's procedural obligations", the Court

must focus on whether plaintiffs "had an adequate opportunity to participate in the development

of [the] IEP."  *Cerra v. Pawling Cent. Sch. Dist.*, 427 F.3d 186, 192 (2d Cir. 2005).  To ensure

parental participation, the IDEA requires:

> An opportunity for the parents of a child with a disability to examine all records
> relating to such child and to participate in meetings with respect to the identification,
> evaluation, and educational placement of the child, and the provision of a free
> appropriate public education to such child, and to obtain an independent educational
> evaluation of the child.

20 U.S.C. § 1415(b)(1).

First, plaintiffs argue that the District failed to present adequate information regarding

Devereux at the July 11, 2005 CSE meeting, and that they were denied the opportunity to

participate in the development of the IEP as a result.  The CSE minutes contain little information

about Devereux, and as plaintiffs' attorney established at the hearing, Mogaka, who attended the

CSE meeting by phone was unable to answer most questions about Devereux.  However, prior to

the July 11, 2005 CSE meeting, the District requested that plaintiffs participate in the intake

process at Devereux and visit the campus in July 2005.  The evidence unequivocally shows that

plaintiffs rejected the recommended placement, did not participate in the intake process or visit

the campus, and had no intention of sending K.O. anywhere but the Family Foundation for the

2005-2005 school year.  Thus, the Court concludes that the evidence does not support plaintiffs'

argument that the District's failure to present adequate information regarding the Devereux

program deprived them of a meaningful opportunity to participate in the development of the IEP.

Second, plaintiffs argue that District violated the procedural requirements of the IDEA by changing the type of diploma K.O. was expected to receive from Regents to "local high school", without discussion.  Even assuming the absence of discussion on this issue was a procedural violation, it did not render the IEP substantively inadequate because school districts are not required to "furnish[] every special service necessary to maximize each handicapped child's potential."  *Rowley*, 458 U.S. at 199.

Third, plaintiffs contend that the IEP failed to include measurable goals in violation of the IDEA.  The IDEA requires "a statement of measurable annual goals," including benchmarks or short-term objectives.  20 U.S.C. § 1414 (d)(1)(A)(I).   Here, the SRO found that the unlike the 2004-2005 IEP, the 2005-2006 IEP accurately described K.O.'s needs, performance levels, peer relationships, oppositional behavior, and anger issues.  The SRO further found that although the IEP contained the same goals and objectives as the prior IEP, it was adequate because they were "expanded and clarified, and are reflective of K.O.'s needs and performance levels."  The SRO noted that several of the added objectives were more specific and included "detailed criteria by which progress can be monitored."  Indeed, the IEP contains additional objectives related to demonstrating self-control, seeking support and assistance with his "anger problem".  The IEP also includes an objective related to K.O.'s classroom participation, which was an area of concern according to his teachers.  Finally, the IEP includes a goal intended to help K.O. develop the ability to "manage anger appropriately".  This goal is accompanied by five objectives, including the identification of "triggers for emotional reactivity", "strategies for maintaining self control", and "alternative ways to express anger" appropriately.   "[W]hether a procedural or a substantive issue-the sufficiency of goals and strategies in an IEP is precisely the type of issue upon which

the IDEA requires deference to the expertise of the administrative officers." *Grim*, 346 F.3d at 382. Even assuming, as plaintiffs argue, that the IEP should have contained goals related to K.O.'s need in the area of written expression, in view of its overall procedural adequacy, as discussed, that omission alone is insufficient to render it substantively inadequate and unlikely to produce progress.

Fourth, plaintiffs argue that the IEP failed to include appropriate measurable postsecondary goals as required by 8 N.Y.C.R.R. § 200.4(d)(2)(ix)(b). Pursuant to N.Y.C.R.R. tit. 8, § 200.4(d)(2)(ix), all proposed IEPs for students fifteen years or older shall "include ... a statement of the responsibilities of the school district and, when applicable, participating agencies for the provision of such services and activities that promote movement from school to postschool opportunities, or both, before the student leaves the school setting." The IDEA has a parallel requirement for all proposed IEPs for students sixteen years or older. *See* 20 U.S.C. § 1414(d)(1)(A)(i)(VIII). Transition services are defined as "a coordinated set of activities . . . to facilitate the student's movement from school to post-school activities, including, but not limited to, post-secondary education," N.Y.C.R.R. tit. 8, § 200.1(fff).

In this case, the IEP specifies that K.O. "plans to attend college and further his education. He will explore various careers and interests with the counselor." This statement sufficiently describes K.O.'s goal of attending college and alerts the counselors and teachers regarding the CSE's expectations for K.O. as well as K.O.'s own intentions following his completion of high school.[11] Accordingly, plaintiffs' argument is without merit.

––––––––––––––

[11]It is uncontroverted that the Family Foundation would not make K.O. available to attend the CSE meeting in question, despite an express invitation from Race. Further, Race testified that she had hoped K.O. would participate and assist the CSE "with the transition planning piece of

Fourth, plaintiffs argue that the SRO erred in finding that no regular education teacher was required at the July 11, 2005, CSE meeting and further assert that the absence of a regular education teacher rendered the IEP a nullity.  The IDEA requires the presence of a general education teacher at the CSE meeting where "a child is, or may be, participating in the regular education environment," 20 U.S.C. § 1414(d)(1)(B)(ii).  Even if the absence of a general education teacher violated the IDEA, the IEP is not rendered a "nullity", unless the absence "impeded the child's right to a free appropriate public education", "significantly impeded" their "opportunity to participate in the decision making process", or  "caused a deprivation of educational benefits."  20 U.S.C. § 1415(f)(3)(E)(ii).

Plaintiffs argue that the absence of a regular education teacher at the July 11, 2005 CSE meeting "hampered" their ability to participate in the development of an IEP for K.O., and assert that had one been present, he or she could have addressed the issue regarding a Regents diploma, and "could have explained to the CSE that K.O.'s placement in Devereux would not provide any educational benefits for K.O."

 The IDEA provides in relevant part that a regular education teacher "shall, to the extent appropriate, participate in the development of the IEP of the child, including the determination of appropriate positive behavioral interventions and supports, and other strategies, and the determination of supplementary aids and services, program modifications, and support for school personnel".  20 U.S. C. § 1414(d)(3)(C).

In this case, as the SRO noted, at the May 10, 2005 meeting the CSE discussed, with the regular education teacher's participation, K.O.'s "classification, levels of performance,

the IEP".  T. 67.

45

supplementary aids and services and programs[,] modifications and supports, testing

accommodations, participation in the general education, related services, and goals and

objectives".   The July 11, 2005 meeting, in contrast, centered on a review of K.O.'s potential

placement at Devereux.  Moreover, although plaintiffs argue that the change in type of high

school diploma the CSE expected K.O. to obtain from "Regents" to "local", a school district

complies with the IDEA's substantive requirements if the IEP is "reasonably calculated enable

the child to receive educational benefit[s]", *Rowley*, 458 U.S. at 207.  "A school district is not,

however, required to furnish 'every special service necessary to maximize each handicapped

child's potential.'" *Cerra*, 427 F.3d at 195 (citing *Carlisle Area Sch. v. Scott P.*, 62 F.3d 520, 534

(3d Cir. 1995) (school districts "need not provide the optimal level of services, or even a level

that would confer additional benefits, since the IEP required by IDEA represents only a 'basic

floor of opportunity' ")).  Thus, to the extent plaintiffs argue the absence of a regular education

teacher rendered the IEP substantively inadequate, their argument is without merit.

Further, at least one parent and plaintiffs' attorney were present at every CSE meeting and

the evidence uniformly shows that the only IEP proposal plaintiffs would have accepted was a

placement at the Family Foundation.  Thus, the absence of a regular education teacher did not

impede their opportunity to participate in the decision making process.  Accordingly, the Court

defers to the conclusion of the SRO that the absence of a regular education teacher at the July 11,

2005 CSE meeting did not render the IEP inadequate.

Finally, plaintiffs argue that the District failed to evaluate K.O. properly before

determining he required residential placement, a significant change in placement, in violation of

the IDEA.  Pursuant to the regulations implementing the IDEA, school districts "shall conduct an

46

evaluation . . . before taking any action with respect to the initial placement of the person in regular or special education and any subsequent significant change in placement."  34 C.F.R. § 104.35(a).  The District asserts that Dr. Fras re-evaluated K.O. on December 22, 2004, and changed K.O.'s diagnosis, to oppositional defiant disorder, severe.  Further, plaintiffs do not assert that a new evaluation would have led to a different recommendation and, indeed, have maintained for several years that the District should have recommended residential placement.  Thus, there is no basis for concluding that any procedural defect on this score impeded their participation or deprived K.O. of a free appropriate public education.[12]

Having considered the additional evidence,[13] each of plaintiffs' arguments, the record in its entirety and according deference to the SRO, the Court concludes that plaintiffs have not shown by a preponderance of the evidence that the District failed to provide a free appropriate public education for the 2005-2006 school year.  Thus, the Court need not consider whether the Family Foundation was an appropriate placement for K.O. during the 2005-2006 school year.  Accordingly, the District's cross-motion for summary judgment dismissing plaintiffs' IDEA claim is granted and plaintiffs' motion for summary judgment is denied.

---

[12]Other than the arguments outlined above, plaintiffs have not advanced any specific argument regarding the substantive adequacy of the 2005-2006 IEP.  Although plaintiffs' Reply Memorandum of Law contains a heading regarding the substantive adequacy of this IEP, Dkt. No. 20, p. 18, their arguments reflect their belief that the District's decision to place K.O. at Devereux was "an extraordinary cynical move" to avoid a lawsuit.

[13]Plaintiffs appended a newspaper article to their memorandum of law in support of their motion for summary judgment.  This article is not in proper evidentiary form and is irrelevant to the issues before the Court.  Accordingly, it has not been considered.  Plaintiffs have also included an affidavit by K.O.'s father that they also submitted in connection with *Omidian I*, which discusses K.O.'s progress and acceptance at Pace University.  The Court has noted the evidence regarding K.O.'s college acceptance above.

**B.      Second Cause of Action:  Rehabilitation Act**

In their second cause of action, plaintiffs claim the District failed to evaluate and place K.O. in an appropriate educational setting in violation of Section 504 of the Rehabilitation Act. The parties cross-move for summary judgment on this issue.

Section 504, in pertinent part, provides that "[n]o otherwise qualified individual with a disability ... shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794(a).  To prove a violation of the Rehabilitation Act, plaintiffs must show that: (1) K.O. is an individual with a disability; (2) K.O. is otherwise qualified for benefits under a federally funded program; and (3) K.O. has been denied those benefits because of his disability.  *Doe v. Pfrommer*, 148 F.3d 73, 82 (2d Cir. 1998). "In the special education context, courts have held that a plaintiff must demonstrate more than an incorrect evaluation or substantively faulty IEP to establish liability; a plaintiff must show that defendants acted with bad faith or gross misjudgment."  *R.B. v. Board of Educ. of the City of New York*, 99 F.Supp. 2d 411, 419 (S.D.N.Y. 2000) (citing *Wenger v. Canastota Cent. Sch. Dist.*, 979 F.Supp. 147, 152 (N.D.N.Y. 1997), *aff'd mem.*, 208 F.3d 204 (2d Cir. 2000)).  "The plaintiff is not required to show personal animosity or ill will. Rather, intentional discrimination may be inferred when a school district acts with gross negligence or reckless indifference in depriving a child of access to a" free appropriate public education.  *Gabel v. Board of Educ. of Hyde Park Cent. Sch. Dist.*, 368 F. Supp. 2d 313, 334 (S.D.N.Y. 2005)

Viewing the evidence in the light most favorable to plaintiffs, K.O. was a qualified individual, and the District failed to offer K.O. a free appropriate public education for the 2004-

48

2005 school year.  Plaintiffs further argue that the District's failure to place K.O. in a residential

facility between 2001 and 2005 is evidence of its indifference and discrimination against K.O.  As

stated, a substantively faulty IEP, without more, is insufficient to establish a claim under the

Rehabilitation Act.  *See R.B. v. Board of Educ. of the City of New York*, 99 F.Supp. 2d at 419.

Plaintiffs cite no other evidence in support of their claim.  Thus, there are no questions of material

fact requiring trial.  Accordingly, the District's motion for summary judgment on this claim is

granted.

**V.      CONCLUSION**

        For the foregoing reasons, it is hereby

        **ORDERED** that plaintiffs' motion for summary judgment is denied in its entirety; and it

is further

        **ORDERED** that defendant's cross-motion for summary judgment is granted in its

entirety; and it is further

        **ORDERED** that the complaint is dismissed with prejudice; and it is further

        **ORDERED that the Clerk of the Court close this case.**

        **IT IS SO ORDERED.**

Date:  March 31, 2009

_____
Norman A. Mordue
Chief United States District Court Judge

49